## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF:

THE PREMISES LOCATED AT
3001 Chestnut Street NW
Washington, D.C. 20015-1407

## AFFIDAVIT IN SUPPORT OF AN APPLICATION
## UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Sherman Wooden, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a warrant to search the premises known as 3001 Chestnut Street

NW, Washington, D.C. 20015-1407, hereinafter "PREMISES," further described in Attachment

A, for the things described in Attachment B.

2.     I am a Special Agent with Homeland Security Investigations ("HSI") and have

been so employed for more than eight (8) years.  I am currently assigned to the Northern

Virginia-Washington, D.C. Internet Crimes Against Children ("ICAC") task force.  I have

received training from the Federal Law Enforcement Training Center and other law enforcement

agencies in the areas of child pornography investigations and pedophile behavior.  As part of my

current duties as an HSI agent, I investigate criminal violations relating to child exploitation and

child pornography, including violations pertaining to the illegal production, distribution, receipt

and possession of child pornography, in violation of 18 U.S.C. §§ 2251, 2252 and 2252A.  I have

received training in the areas of child pornography and child exploitation and, in my law enforcement capacity, have observed and reviewed numerous examples of child pornography as defined in 18 U.S.C. § 2256 in all forms of media, including computer media.

3.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

4.     On various dates between April 2014 and September 2014, the undersigned affiant used a law enforcement tool to review Internet Protocol ("IP") addresses that (1) had been recorded by the law enforcement tool as sharing suspected child pornography images or videos, identified by their unique SHA1 hash values, on a peer-to-peer ("P2P") file-sharing network; and (2) were believed to resolve back to physical addresses located in the District of Columbia based on a commercial geolocation program utilized by the law enforcement tool. An IP address is unique to a particular computer during an online session and makes it possible for data to be transferred directly between computers.

5.     The law enforcement tool indicated that the IP address 66.44.63.109 ("Target IP") was used to share known child pornography images and/or videos and that the computer using the IP address was physically located in the District of Columbia.

6.     Between April 28, 2014, and September 30, 2014, your affiant attempted to download suspected child pornography files directly from the Target IP on multiple occasions but was not successful. However, using the law enforcement tool, your affiant has been able to view, on multiple occasions, a list of suspected child pornography files that the Target IP has made available to share with other users on the P2P networks. The list included the file name,

2

date and time the file was available, the file's hash value, the Globally Unique Identifier ("GUID") of the file-sharing client,[1] and file size.

7.     On April 28, 2014, your affiant learned that since June 27, 2013, the Target IP was on two P2P networks, eDonkey and Gnutella, with a total of approximately 363 suspected child pornography files available for sharing during that time period. The Target IP was using the file-sharing client Shareaza, which can operate on both the eDonkey and Gnutella network. Two of the files were offered for sharing by the Target IP on April 28, 2014 at 8:44:29 Greenwich Mean Time ("GMT") and at 16:34:20 GMT. The following is the name and the Secure Hash Algorithm 1 ("SHA1") hash value for the two files:

> **File #1 Name:** 2yo ass fuck she cries for mommy nasty pthc pedo 1yo 3y 4yo.mpg
> SHA1 Base 32 Hash Value: WY4ESREJEUQ7ZVATZEWE2D4GWTWQEXG6

> **File #2 Name:** pedo – 12yo girl sucks cock with mom.mpg
> SHA1 Base 32 Hash Value: FWLZD3YDRCI4A7D4UYULI5GIUHE2523C

8.     Although your affiant was not able to establish a direct connection and download any files directly from the Target IP, your affiant was able to view an exact copy of the files above based on the SHA1 Base 32 hash value. The exact copies were acquired by law enforcement during previous investigations and are known child pornography.

---

[1]     The Globally Unique Identifier (GUID) is a series of letters and numbers assigned to a computer when a file-sharing client is installed on a computer. The GUID will remain the same even if the user utilizes a different IP address. This allows law enforcement to track IP addresses across the Internet when a user receives different IP addresses from the ISP. However, with respect to the file-sharing client eMule, a new GUID will be created on the computer if the user removes the file-sharing client and then re-installs eMule. Based on other peer-to-peer clients, generally an upgrade to a newer version will not change the GUID but the installation of a newer version will change the GUID.

9.     Your affiant viewed an exact copy of File #1 and determined that it depicted child pornography. The file is a video is approximately 2 minutes and 18 seconds in length and begins with an unidentified adult male inserting his penis into the anus of a prepubescent female minor, who appears to be under the age of five. Approximately 15 seconds into the video, the female minor cries "no" while the adult male says "good baby". The female minor continues crying while the adult male is anally penetrating her. Approximately 45 seconds into the video, the adult male says "stop crying" and continues to penetrate her. The adult continues to penetrate the female minor's anus while the female minor cries "mommy" numerous times until the end of the video, when he removes his penis and ejaculates. The video ended shortly thereafter.

10.     Your affiant viewed an exact copy of File #2 and determined that it depicted child pornography. The file is a video that is approximately 12 minutes and 24 seconds in length. The video begins with a nude prepubescent female minor lying on a couch with an unidentified adult male. The female minor is masturbating the adult male. This continues for approximately 4 minutes and 15 seconds. At this point in the video, the female minor is rubbing the adult male's penis on her vagina. This continues for approximately 2 minutes and 30 seconds. At this point in the video, the female minor begins performing oral copulation on the adult male. This continues for approximately 2 minutes. At this point in the video, the female minor begins rubbing the adult male's penis on her vagina again. Approximately one minute later, an adult female is seen in the video performing oral copulation on the adult male while the female minor watches. The female minor then performs oral copulation on the adult male while the adult female watches. The adult female begins to rub the female minor's vagina while the female minor continues to perform oral copulation on the adult male. The video ends shortly thereafter.

4

11.     On or about May 11, 2014, your affiant sent a Department of Homeland Security (DHS) summons to RCN Telecom, which was the ISP for the Target IP, requesting subscriber information for the Target IP on April 28, 2014 at 8:44:29 GMT and 16:34:20 GMT, the dates and times that File #1 and File #2 were made available for sharing on the P2P network. On May 12, 2014, RCN returned the Target IP subscriber information. According to RCN, the Target IP was leased to the PREMISES (3001 Chestnut Street NW, Washington, D.C. 20015.) The name on the account was Amy PADOLL.

12.     On or about May 12, 2014, your conducted an address query in the Consolidated Lead Evaluation and Reporting (CLEAR) database. CLEAR returned information that showed two individuals named Michael and Amy CENTANNI were most recently associated with the PREMISES. CLEAR also showed several vehicles registered to both Michael and Amy CENTANNI at the PREMISES. The vehicles included two Fiats, a Mini Cooper, and an Alfa Romeo. CLEAR showed that on April 7, 2006, Michael and Amy CENTANNI purchased the PREMISES.

13.     On or about May 12, 2014, your affiant conducted a driver's license query in the National Law Enforcement Telecommunications System (NLETS) for Michael CENTANNI. According to NLETS, Michael CENTANNI possessed a current Washington, D.C. driver's license. The address listed on the license was the PREMISES.

14.     On or about May 13, 2014, your affiant conducted surveillance and took pictures of the PREMISES. I observed four vehicles parked in the driveway: a Chevrolet Suburban with D.C. license plate CFF0005, a Mini Cooper with D.C. license plate CFF0002, an unknown

vehicle with D.C. license plate CFF0001, and a Toyota Camry with Pennsylvania license plate JGE3766.

15.     On or about May 14, 2014, I conducted vehicle queries in NLETS for the vehicles located in the driveway of the PREMISES. According to NLETS, the Chevrolet Suburban was registered to Century Data Systems at 1155 15th Street NW, Suite 410, Washington, D.C.; the Mini Cooper was registered to Michael CENTANNI at the PREMISES; the unknown vehicle with DC license plate CFF0001 was registered to Amy CENTANNI at the PREMISES; and Toyota Camry was registered to a residence in Gettysburg, Pennsylvania.

16.     Between July 30, 2013 and August 28, 2014, the Target IP was seen with approximately 402 suspect child pornography files available for sharing on the eDonkey and Gnutella networks.

17.     On or about September 10, 2014, I sent a DHS summons to RCN Telecom, requesting subscriber information for the Target IP on August 26, 2014 at 08:12:32 GMT and on August 27, 2014 at 02:35:07 GMT. On these exact dates and times, the Target IP was seen with suspected child pornography files (based upon the file names) available for sharing. On October 1, 2014, RCN returned the Target IP subscriber information. According to RCN, the Target IP was leased to the PREMISES (3001 Chestnut Street NW, Washington, D.C. 20015.) The name on the account was Amy PADOLL

18.     On October 6, 2014, I queried a second law enforcement tool that operates in the same manner as the aforementioned law enforcement tool but may have additional information captured from file-sharing networks. This second law enforcement tool showed that on September 21, 2014, the Target IP was seen on the Gnutella network with suspected child

6

pornography files available for sharing. I was unable to view an exact copy of these suspect child pornography files, but some of the file names were indicative of child abuse material. The file names included "PEDO-PTHC- SELECTED – 2014- ONLY THE BEST (57).avi", "(pthc pedo)11yo-13yo suck first lesbo play.avi", and "[ 2 Daughters + Neighbour Daughter ] gst-03.jpg."

## DEFINITIONS/TECHNICAL TERMS

19.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.      IP Address:  The Internet Protocol address (or simply "IP") is a unique numeric address used by computers on the Internet.  An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

b.      The Internet is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

7

c.      "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can.  In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext.  This is usually done with the use of an encryption key, which specifies how the message is to be encoded.  Any adversary that can see the ciphertext should not be able to determine anything about the original message.  An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

d.      "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website.

e.      "Child Erotica" means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions.

f.      "Child Pornography" means the definition in 18 U.S.C. § 2256(8) (any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct), as well as any visual depiction, the

8

production of which involves the use of a minor engaged in sexually explicit conduct. *See* 18 U.S.C. §§ 2252 and 2256(2)(8).

g.     "Computer" means "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device." See 18 U.S.C. § 1030(e)(1).

h.     "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

i.     "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include

programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

j.      "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

k.      "Computer-related documentation" means written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, computer software, or other related items.

l.      "Domain Name" means the common, easy-to-remember names associated with an Internet Protocol address. For example, a domain name of "www.usdoj.gov" refers to the Internet Protocol address of 149.101.1.32. Domain names are typically strings of alphanumeric characters, with each level delimited by a period. Each level, read backwards – from right to left – further identifies parts of an organization. Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and, .edu for edOCEtional organizations. Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice. Additional levels may exist as needed until each machine is uniquely identifiable. For example, www.usdoj.gov identifies the World

10

Wide Web server located at the United States Department of Justice, which is part of the United States government.

m.      "Internet Connection" means a connection required for access to the Internet. The connection would be provided by cable, DSL (Digital Subscriber Line) or satellite systems.

n.      "Internet Service Providers" or "ISPs" mean commercial organizations which provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer various means by which to access the Internet including telephone based dial-up, broadband based access via a digital subscriber line (DSL) or cable television, dedicated circuits, or satellite based subscription. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth that the connection supports. Many ISPs assign each subscriber an account name such as a user name or screen name, an e-mail address, and an e-mail mailbox, and the subscriber typically creates a password for the account. By using a computer equipped with a telephone or cable modem, the subscriber can establish communication with an ISP over a telephone line or through a cable system, and can access the Internet by using his or her account name and password.

o.      "Minor" means any person under the age of eighteen years. *See* 18 U.S.C. § 2256(1).

11

p.      A "modem" translates signals for physical transmission to and from the Internet Service Provider, which then sends and receives the information to and from other computers connected to the Internet.

q.      A "router" often serves as a wireless access point and directs traffic between computers connected to a network (whether by wire or wirelessly).  A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf.  The router also distributes to the relevant client inbound traffic arriving from the Internet.  The router is in turn typically connected to a modem.

r.      "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any persons.  See 18 U.S.C. § 2256(2).

s.      "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image.  See 18 U.S.C. § 2256(5).

t.      "Website" consists of textual pages of information and associated graphic images.  The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

12

u. "Wireless network" as used herein means a system of wireless communications in which signals are sent and received via electromagnetic waves such as radio waves. Each person wanting to connect to a wireless network needs a computer which has a wireless network card that operates on the same frequency. Many wired networks base the security of the network on physical access control, trusting all the users on the local network. But, if wireless access points are connected to the network, anyone in proximity to the network can connect to it. A wireless access point is equipment that connects to the modem and broadcasts a signal. It is possible for an unknown user who has a computer with a wireless access card to access an unencrypted wireless network. Once connected to that network, the user can access any resources available on that network to include other computers or shared Internet connections.

v. "Secure Hash Algorithm Version 1 hash value" (SHA 1 hash value) is an algorithm that processes digital files, resulting in a 160-bit value that is unique to that file. It is computationally infeasible for two files with different content to have the same SHA 1 hash value. By comparing the hash values of files, it can be concluded that two files that share the same hash value are identical with a precision that exceeds 99.9999 percent certainty. There is no known instance of two different child pornographic images or videos having the same SHA1 hash value.

w. "Peer to Peer file sharing" (P2P) is a method of communication available to Internet users through the use of special software, which may be downloaded from the Internet. In general, P2P software allows a user to set up files on a computer to be shared with other computer users running compatible P2P software. A user may obtain files by

13

opening the P2P software on the user's computer and searching for files that are currently being shared on the network. A P2P file transfer is assisted by reference to the IP addresses of computers on the network: an IP address identifies the location of each P2P computer and makes it possible for data to be transferred between computers. One aspect of P2P file sharing is that multiple files may be downloaded at the same time. Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network. However, a tool used by law enforcement restricts the download so that the file is downloaded, in whole or in part, from a single user on the network.

    i.        When a user wishes to share a file, the user adds the file to his a shared library files (either by downloading a file from another user or by copying any file into the shared directory), and the file's SHA 1 has value is recorded by the P2P software. The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

    ii.       Third party software is available to identify the IP address of a P2P computer that is sending a file. Such software monitors and logs Internet and local network traffic.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

20.    As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or on other electronic storage media or digital devices. As used herein, the terms "electronic storage media"

14

and "digital devices" include any electronic system or device capable of storing or processing

data in digital form, including central processing units; desktop computers, laptop computers,

notebooks, and tablet computers; personal digital assistants; wireless communication devices,

such as telephone paging devices, beepers, mobile telephones, and smart phones; digital

cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters,

monitors, and drives intended for removable media; related communications devices, such as

modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks,

USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data

(excluding analog tapes such as VHS); and security devices.  Thus, the warrant applied for

would authorize the seizure of electronic storage media and digital devices or, potentially, the

copying of electronically stored information, all under Rule 41(e)(2)(B).

21.     *Probable Cause.*  Based on my knowledge, training, and experience, as well as

information related to me by agents and others involved in this investigation and in the forensic

examination of digital devices, I respectfully submit that if electronic storage media or digital

devices are found on the PREMISES, there is probable cause to believe that the records and

information described in Attachment B will be stored in the electronic storage media and digital

devices for at least the following reasons:

a.      Based on my training and experience, as well as my discussions with

others involved in child pornography investigations, computers and computer technology

have revolutionized the way in which child pornography is produced, distributed,

received, and possessed.

15

b.      Individuals who engage in online criminal activity, including Possessing,
Receiving or Distributing Child Pornography in violation of Title 18 USC Sections 2252
and 2252A, utilize the internet and computers to allow them to obtain the material in
relatively secure and anonymous way.  Individuals who have a sexual interest in child or
images of children often maintain their collections that are in a digital or electronic
format in a safe, secure and private environment, such as a computer or flash drive.
These collections are often maintained for several years and are kept close by, usually at
the collector's residence.  Individuals with a sexual interest in children or images of
children also may correspond with and/or meet others to share information and materials;
rarely destroy correspondence from other child pornography distributors/collectors;
conceal such correspondence as they do their sexually explicit material; and often
maintain lists of names, addresses, and telephone numbers of individuals with whom they
have been in contact and who share the same interests in child pornography.

c.      Individuals who engage in the foregoing criminal activity, in the event that
they change computers, will often "back up" or transfer files from their old computers'
hard drives to that of their new computers, so as not to lose data, including that described
in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

d.      Computer, smart phone, and other digital device files, or remnants of such
files, can be recovered months or even years after they have been downloaded onto an
electronic storage medium, deleted, or viewed via the Internet.  Electronic files
downloaded to an electronic storage medium can be stored for years at little or no cost.
Even when such files have been deleted, they can be recovered months or years later

using readily-available forensics tools.  When a person "deletes" a file on a digital device such as a home computer or a smart phone, the data contained in the file does not actually disappear; rather, that data remains on the electronic storage medium until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the electronic storage medium that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.  In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve "residue" of an electronic file from an electronic storage medium depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

22.    *Forensic Evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence or information that establishes how electronic storage media or digital devices were used, the purpose of their use, who used them, and when.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this

17

investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be on electronic storage media and digital devices in the PREMISES because:

      a.     Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole.  Digital data on the electronic storage media not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a computer were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use.  Computer, smart phone, and

18

other digital device file systems can record data about the dates files were created and the

sequence in which they were created. This data can be evidence of a crime, indicate the

identity of the user of the digital device, or point toward the existence of evidence in

other locations. Recovery of this data requires specialized tools and a controlled

laboratory environment, and also can require substantial time.

b.      Forensic evidence on a computer or storage medium can also indicate who

has used or controlled the computer or storage medium. This "user attribution" evidence

is analogous to the search for "indicia of occupancy" while executing a search warrant at

a residence. For example, registry information, configuration files, user profiles, e-mail,

e-mail address books, "chat," instant messaging logs, photographs, the presence or

absence of malware, and correspondence (and the data associated with the foregoing,

such as file creation and last-accessed dates) may be evidence of who used or controlled

the computer or storage medium at a relevant time.

c.      A person with appropriate familiarity with how a computer works can,

after examining this forensic evidence in its proper context, draw conclusions about how

computers were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or

other forms of forensic evidence on storage media that are necessary to draw an accurate

conclusion is a dynamic process. While it is possible to specify in advance the records to

be sought, electronic storage media and digital device evidence is not always data that

can be merely reviewed by a review team and passed along to investigators. Whether

data stored on electronic storage media or digital devices is evidence may depend on

other information stored on the devices and the application of knowledge about how the devices behave.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

     e.    Further, in finding evidence of how electronic storage media or a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device.  For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

     f.    I know that when an individual uses a digital device to: visually depict child pornography or child erotica; display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess, or receive child pornography, child erotica, or information pertaining to an interest in child pornography or child erotica, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The digital device is also likely to be storage medium for evidence of crime. From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

20

23.   *Methods To Be Used To Search Digital Devices.*  Based on my knowledge,
training, and experience, as well as information related to me by agents and others involved in
this investigation and in the forensic examination of digital devices, I know that:

a.   Searching digital devices can be an extremely technical process, often
requiring specific expertise, specialized equipment, and substantial amounts of time.
There are so many types of digital devices and software programs in use today that it is
impossible to bring to the search site all of the necessary technical manuals, specialized
equipment, and software programs necessary to conduct a thorough search.  Digital
devices – whether, for example, desktop computers, mobile devices, or portable storage
devices – may be customized with a vast array of software applications, each generating a
particular form of information or records and each often requiring unique forensic tools,
techniques, and expertise.  As a result, it may be necessary to consult with specially
trained personnel who have specific expertise in the types of digital devices, operating
systems, or software applications that are being searched, and to obtain specialized
hardware and software solutions to meet the needs of a particular forensic analysis.

b.   Digital data is particularly vulnerable to inadvertent or intentional
modification or destruction.  Searching digital devices can require the use of precise,
scientific procedures that are designed to maintain the integrity of digital data and to
recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery
of "residue" of electronic files from electronic storage media also requires specialized
tools and often substantial time.  As a result, a controlled environment, such as a law

enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.      The volume of data stored on many digital devices will typically be so large that it will be extremely impractical to search for data during the physical search of the premises.  Smart phones capable of storing 64 gigabytes, flash drives capable of storing 128 gigabytes, and desktop computers capable of storing 500 or more gigabytes are now commonplace.  Consequently, just one device might contain enormous amounts of data.

d.      Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself.  Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

e.      Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files;

however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

     f.     Analyzing the contents of mobile devices can be very labor intensive and also requires special technical skills, equipment, and software.  The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device.  Additionally, most smart phones and other mobile devices require passwords for access.  For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode.  Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer.  Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many.  For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

     g.     Based on all of the foregoing, I respectfully submit that searching any electronic storage media or digital device for the information, records, or evidence subject to seizure pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete.  Any pre-defined search

protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the media or devices.  In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

      h.     In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

         1.     Upon securing the PREMISES, law enforcement personnel will, consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, seize any electronic storage media or digital devices, as defined above, deemed capable of containing the information, records, or evidence described in Attachment B and transport these items to an appropriate law enforcement laboratory or similar facility for review.  For all the reasons described above, it would not be feasible to conduct a complete, safe, and appropriate search of any such electronic storage media or digital devices at the PREMISES.  The electronic storage media and digital devices, and/or any digital images thereof created by law enforcement in aid of the examination and review, will be examined and reviewed by law enforcement personnel in order to extract and seize the information, records, or evidence described in Attachment B.

2.     The analysis of the contents of any seized electronic storage media or digital devices may entail any or all of various forensic techniques as circumstances warrant.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

3.     In searching the seized electronic storage media or digital devices, the forensic examiners may examine as much of the contents of the electronic storage media or digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B.  In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B.  Any search techniques or protocols used in searching the contents of the seized electronic

26

storage media or digital devices will be specifically chosen to identify only the specific items to be seized under this warrant.

## CONCLUSION

24.     Based on the above information, there is probable cause to believe that (1) an individual residing at the Subject Premises used a computer connected to the Internet from the Subject Premises to violate Title 18, United States Code, Sections 2252(a) and 2252A(a), which make it a federal crime for any person to knowingly receive, distribute or possess child pornography; and (2) the fruits, evidence, contraband and instrumentalities of these offenses, described in Attachment B are located at the PREMISES .

25.     Based upon the foregoing, I respectfully request that this Court issue a search warrant for the PREMISES described in Attachment A, authorizing the seizure of the items described in Attachment B.

Respectfully submitted,

_____
Sherman Wooden
Special Agent
Homeland Security Investigations

Subscribed and sworn to before me
on October 8, 2014:

_____
The Honorable Deborah A. Robinson
UNITED STATES MAGISTRATE JUDGE